**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SIDNEY SANDOZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| | ) Case No. 1:21-cv-07683-VSB |
| Plaintiff, | ) |
| | ) |
| vs. | ) <u>CLASS ACTION</u> |
| | ) |
| WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, | ) ) **AMENDED CLASS ACTION** ) **COMPLAINT FOR VIOLATIONS** ) **OF THE SECURITIES ACT OF** ) **1933** ) ) ) ) ) ) ) <u>DEMAND FOR JURY TRIAL</u> ) |
| | ) |
| Defendants. | ) ) |
| | ) |

1

<u>TABLE OF CONTENTS</u>

Page

OVERVIEW ............................................................................................................... 1

JURISDICTION AND VENUE ................................................................................... 5

PARTIES .................................................................................................................... 6

    A.  Lead Plaintiff .................................................................................................... 6

    B.  Corporate Defendant ......................................................................................... 6

    C.  Individual Defendants ....................................................................................... 6

    D.  Cogency Global Defendants .............................................................................. 7

    E.  Underwriter Defendants ..................................................................................... 8

CONFIDENTIAL WITNESSES ................................................................................ 11

FACTUAL BACKGROUND ...................................................................................... 12

    A.  About Waterdrop .............................................................................................. 12

    B.  Increasing Regulations Force Waterdrop to Discontinue its Mutual Aid Platform ........... 15

    C.  Waterdrop's Initial Public Offering ................................................................. 20

    D.  Events Following the IPO Reveal the Truth about Waterdrop's Registration Statement .. 24

MATERIALLY FALSE AND MISLEADING STATEMENTS ................................... 31

AND OMISSIONS IN THE REGISTRATION STATEMENT ................................... 31

    A.  First Quarter 2021 Financial Results ............................................................... 31

    B.  Waterdrop's Operating Costs and Expenses .................................................... 32

    C.  Discontinuation of Mutual Aid ........................................................................ 35

    D.  Increasing Chinese Regulatory Scrutiny ......................................................... 37

CLASS ACTION ALLEGATIONS ............................................................................ 41

THE STATUTORY SAFE HARBOR DOES NOT APPLY ........................................ 43

CLAIMS FOR RELIEF ............................................................................................. 43

PRAYER FOR RELIEF ............................................................................................. 46

JURY TRIAL DEMANDED ...................................................................................... 46

## AMENDED COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiff Qi Mi, by and through Lead Counsel, and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of Waterdrop Inc. ("Waterdrop" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Waterdrop's press releases; (v) analyst reports and independent media reports regarding Waterdrop, its stock price movement, pricing, and volume data; (vi) other publicly available material and data; and (vii) interviews of persons with knowledge of the allegations contained herein, including former employees of Waterdrop and relevant third parties. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants and/or are exclusively within their custody or control. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## OVERVIEW[1]

1.      This is a securities class action litigation on behalf of all individuals and entities that purchased or acquired Waterdrop American Depositary Shares ("ADSs") pursuant or traceable to the Company's false and misleading registration statement and prospectus, as amended

---

[1] Unless otherwise indicated, original source emphasis (bolding, underlines, and/or italics) has been removed, and all emphasis in this Complaint has been added by undersigned counsel. Any Chinese language websites were translated using Google Translate.

(collectively, the "Registration Statement"),[2] issued in connection with Waterdrop's May 2021 initial public offering (the "IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Waterdrop, certain of its officers, directors, representatives, and the underwriters of the IPO (collectively, "Defendants").

2.    Based in China, Waterdrop has historically operated three segments: (i) an insurance marketplace that matches consumers with life insurance products; (ii) a medical crowdfunding platform which enables people to provide donations to people with significant medical costs; and (iii) a mutual aid platform, which enabled people suffering from over 100 types of critical illness to spread their medical cost burdens. Waterdrop earns the vast majority of its revenues from commissions received from insurance companies for insurance products sold on the Waterdrop platform. The Company did not derive significant profits from its crowdfunding and mutual aid platforms; rather, these segments provided free advertising and data collection, significantly lowering Waterdrop's customer acquisition costs. The crowdfunding and mutual aid platforms also allowed Waterdrop to present itself as having a "positive social impact," an image which resonated with customers, even though Waterdrop operated as a for-profit company. The Company discontinued its mutual aid segment in March 2021, shortly before its IPO.

3.    In late 2020, the China Banking and Insurance Regulatory Commission ("CBIRC") began closely scrutinizing internet-based insurance companies, including online mutual aid platforms. The CBIRC determined these platforms had a high risk for fraud and began implementing regulations that essentially forced most online mutual aid programs to shut down in

---

[2] As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement on Form F-1 that was filed by the Company on April 16, 2021, all amendments thereto, and the Prospectus filed on Form 424B4 on May 7, 2021, which was incorporated into and formed a part of the Registration Statement that became effective on May 6, 2021.

late 2020 and early 2021. The regulatory environment was so hostile to internet-based insurance companies that industry experts predicted most small and medium-sized companies would not survive to see the end of 2022.

4.    In response to the regulatory scrutiny, Waterdrop announced on March 26, 2021 that it would cease operating its mutual aid segment on March 31, 2021, the last day of the first quarter of 2021 ("Q1:21"). The CBIRC also publicly criticized other aspects of Waterdrop's insurance business, such as a policy that fraudulently advertised "3 yuan for the first month" but did not disclose the costs of the remaining 11 months of the policy. Reuters even reported that Chinese regulators discussed preventing Waterdrop's IPO due to the risky nature of its business. Defendant Shen, however, denied these reports.

5.    On May 7, 2021, over a month after the close of Q1:21 and into the second quarter of 2021 ("Q2:21"), Waterdrop began trading publicly on the NYSE, raising $360 million. The Registration Statement disclosed the cessation of Waterdrop's mutual aid platform, but it obscured the true reasoning behind the cessation, thus also downplaying the effects that the hostile regulatory environment in China was having and would continue to have on the Company. Instead, Waterdrop vaguely disclosed that the purpose of the discontinuation was "to focus on our core business" in light of "increased recognition of our brand," "latest market development," and "recent industry environment changes."

6.    Further, even though the CBIRC was closely monitoring the internet insurance industry and was actively investigating Waterdrop, the Registration Statement only contained a few hypothetical and generic risk statements (that were misleading in their own right) regarding increased regulatory scrutiny in China. The Registration Statement did not indicate that such risks were already occurring or had already materialized. For example, the Registration Statement stated

that "[f]urther development of regulations applicable to us may result in additional restrictions on our business operations," yet it did not mention that increased regulatory scrutiny was the reason Waterdrop ceased its mutual aid program, or that most other Chinese mutual aid programs had been similarly forced to shut down. Nor did the Registration Statement mention a September 20, 2020 study, which referred to Waterdrop's mutual aid program as a risk which "cannot be ignored," or a December 18, 2020 Circular, in which the CBIRC stated it would be investigating certain companies for the illegal practice of advertising a low first monthly rate, but not disclosing that the remainder of the policy would require a higher payment. This December 18, 2020 Circular specifically named Waterdrop as a company that the CBIRC was actively investigating, and noted that it would be subject to fines if it was found to have engaged in illegal activities. Waterdrop later was found to have violated CBIRC policy, and was fined RMB1 million.

7.     Moreover, although Q1:21 ended over a month *before* the IPO, the Registration Statement neglected to disclose that operating costs and expenses had rapidly skyrocketed during the quarter, increasing by more than 75% year over year, which led to a significant net operating loss for the quarter. This increase in costs was due, in large part, to the Company's spending on third-party marketing expenses, which increased 67% year over year in the first quarter. Sales and marketing expenses increased a further 52% quarter over quarter in Q2:21 (or 160.5% year over year), after Waterdrop's mutual aid program closed and could no longer be used as a source for cheap customer leads and data.

8.     Instead of disclosing the rapidly accelerating costs and expenses, the Registration Statement selectively disclosed *only* some positive aspects of the Q1:21 financial results, such as an increase in First Year Premiums ("FYP") and "solid business growth in the first quarter of

2021," thus creating a materially misleading impression of Waterdrop's actual financial condition for that quarter.

9.     The true reasons Waterdrop discontinued its mutual aid program, the increasing pressure from Chinese regulators, the significant increase in costs and expenses in the months leading up to the filing of the Registration Statement, and the true Q1:21 financial results were all facts that were omitted from the Registration Statement, but were necessary to make the statement not misleading. Based on the misleading Registration Statement, Plaintiff, and other members of the Class, purchased Waterdrop ADSs in advance of the IPO and were damaged thereby.

## JURISDICTION AND VENUE

10.     The claims alleged herein arise under sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and o.

11.     This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

12.     This Court has personal jurisdiction over each Defendant, and venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. 191(b), as Defendants conducted the IPO in this District, drafted the Registration Statement in substantial part in this District, disseminated the statements alleged to be false and misleading herein into this District, and solicited purchasers of Waterdrop ADSs in this District. The Waterdrop ADSs issued in the IPO also trade in this District, and Waterdrop's Authorized U.S. Representative for the purposes of the IPO is headquartered in this District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

## PARTIES

### A. Lead Plaintiff

14.    Lead Plaintiff Qi Mi, as set forth in the certification attached hereto as Exhibit A, purchased Waterdrop ADSs pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and has been damaged thereby.

### B. Corporate Defendant

15.    Defendant Waterdrop operates an insurance technology platform and is incorporated in the Cayman Islands and headquartered in Beijing, China. The Company's ADSs trade in New York on the New York Stock Exchange ("NYSE") under ticker symbol "WDH." Each Waterdrop ADS represents ten Class A ordinary shares of the Company. The Company maintains a dual class share structure designed to concentrate control over the Company in the hands of Waterdrop insiders out of proportion with their economic stake. Holders of Class A shares (the shares owned by public investors) are entitled to one vote per share. By contrast, holders of Class B shares (the shares owned by Company insiders) are entitled to nine votes per share.

### C. Individual Defendants

16.    Defendant Peng Shen ("Shen") founded Waterdrop and serves as Waterdrop's Chief Executive Officer ("CEO") and Chairman. Defendant Peng beneficially owned and controlled approximately 70% of Waterdrop's voting shares through his ownership of Class A and Class B shares at the time of the IPO. The Registration Statement stated that Waterdrop was a "controlled company" controlled by Defendant Shen. Defendant Shen signed the Registration Statement on his own behalf and as "attorney-in-fact" for several other signatories.

17.     Defendant Kangping Shi ("Shi") served as Waterdrop's Chief Financial Officer ("CFO") at the time of the IPO. Defendant Shi signed the Registration Statement.

18.     Defendant Nina Zhou ("Zhou") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Zhou.

19.     Defendant Kai Huang ("Huang") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Huang.

20.     Defendant Haiyang Yu ("Yu") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Yu.

21.     Defendant Yao Hu ("Hu") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Hu.

22.     Defendant Guang Yang ("Yang") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Yang.

23.     Defendants Shen, Shi, Zhou, Huang, Yu, Hu, and Yang are referred to herein as the "Individual Defendants." Each of the Individual Defendants reviewed and helped prepare the Registration Statement and, as directors and executive offices of the Company, participated in the solicitation and sale of Waterdrop ADSs to investors in the IPO for their own benefit and the benefit of Waterdrop as directors, executive officers and/or major shareholders of the Company.

**D. Cogency Global Defendants**

24.     Defendant Colleen A. De Vries ("De Vries") served as Waterdrop's Authorized U.S. Representative at the time of the IPO in her position as the Senior Vice President of defendant

Cogency Global Inc. Defendant De Vries, as Senior Vice President of Cogency Global Inc., signed the Registration Statement.

25.     Defendant Cogency Global Inc. ("Cogency Global"), headquartered in New York, was Waterdrop's Authorized U.S. Representative for purposes of the IPO, and defendant De Vries signed the Registration Statement on her own behalf and on behalf of Cogency Global. Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by defendant De Vries as it controlled defendant De Vries at the time of the IPO.

26.     Defendant De Vries and Cogency Global are referred to herein as the "Cogency Global Defendants."

### E.  Underwriter Defendants

27.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

28.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

29.     Defendant BofA Securities, Inc. ("BofA") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

30.     Defendant China Merchants Securities (HK) Co., Limited ("China Merchants") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

31.     Defendant CLSA Limited ("CLSA") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

8

32.     Defendant Haitong International Securities Company Limited ("Haitong International") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

33.     Defendants Goldman Sachs, Morgan Stanley, BofA, China Merchants, CLSA, and Haiton International are collectively referred to herein as the "Underwriter Defendants."

34.     Below is a chart showing the firm number[3] of ADSs each Underwriter Defendant agreed to purchase in the IPO:

| Underwriter | Firm Number of ADSs |
|---|---:|
| Goldman Sachs | 15,300,000 |
| Morgan Stanley | 7,500,000 |
| BofA | 6,300,000 |
| China Merchants | 300,000 |
| CLSA | 300,000 |
| Haiton International | 300,000 |
| **TOTAL:** | **30,000,000** |

35.     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared over $25 million in fees collectively for their services. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Waterdrop ADSs in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and

---

[3] The underwriters had an option to purchase up to an aggregate of 4,500,000 additional ADSs from Waterdrop, subject to certain conditions. One ADS granted the bearer the right to receive ten Class A ordinary shares after the IPO.

counsel, to market Waterdrop ADSs, and those personnel worked on and approved the content of Waterdrop's Registration Statement and other offering materials.

36.     Representatives of the Underwriter Defendants also assisted Waterdrop and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Waterdrop, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Waterdrop's most up-to-date operational and financial results and prospects.

37.     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Waterdrop's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which Waterdrop ADSs would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about Waterdrop would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Waterdrop's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of Waterdrop's existing problems as detailed herein.

38.     The Underwriter Defendants solicited and sold Waterdrop ADSs to Lead Plaintiff and other members of the Class. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

39.     Thus, pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false or misleading statements in the Registration Statement.

## CONFIDENTIAL WITNESSES

40.     Confidential Witness ("CW") 1 was employed by Waterdrop as a customer service staff member from November 2019 to October 2021. CW1 stated that Waterdrop Mutual Aid was an independent segment of Waterdrop, but was well integrated into Waterdrop's overall business. The information of mutual aid customers was stored in the centralized database system of Waterdrop, which could be accessed by Waterdrop's other business teams. CW1 stated that the shutdown of Waterdrop's mutual aid platform was due to regulations put in place by the CBIRC, but that the CEO sent out a letter explaining that it was an "upgrade," and that mutual aid customers would be given a new insurance product that would function "identical to Waterdrop's mutual aid." While CW1 did not know exact numbers, CW1 stated that the increased customer acquisition costs noted in the Q1:21 financial reports were at least partially due to the cessation of the mutual aid platform.

41.     CW2 was employed by Waterdrop as a Finance Business Partner (a managerial financial planning and analysis position) from April 2020 through March 2021. CW2 stated that the cessation of Waterdrop Mutual Aid was due to the CBIRC's new regulatory requirements in early 2021. It was definitely not a "sudden" shutdown. CW2 explained that the market began discussing the CBIRC's regulations in 2020, and some mutual aid platforms ceased their operation in later 2020 or early 2021, before Waterdrop. By March, many more mutual aid platforms, including Waterdrop, had shut down. In early 2021, after Waterdrop employees returned from the Chinese New Year break in February, a few senior staff and the company's executives discussed a cessation plan for the mutual aid platform. Mutual aid service leaders, finance, and some industry

analysts also assisted in preparing the cessation plan. CW2 stated that the shutdown of the mutual aid platform impacted Waterdrop both internally and externally, but did not elaborate on the nature of these impacts.

## **FACTUAL BACKGROUND**

### A.  **About Waterdrop**

42.      Based in China, Waterdrop, known as "Shuidi" in Chinese, operates an insurance technology platform purportedly focused on providing "a positive social impact." Waterdrop takes its name from a Chinese proverb, which essentially translates to "many little drops of water make the ocean." The name has a double meaning, because "water" is also a Chinese slang term for money. The Company began in May 2016 as a mutual aid platform, where individuals could pay small amounts — around $1 USD per month — and the collective fund would be used to pay the medical expenses of eligible beneficiaries. This idea was immensely popular among those without the means to procure a commercial insurance policy or who wished to supplement existing policies. Within just 100 days of launch, Waterdrop had attracted over a million users.[4]

43.      In the following years, online mutual aid programs became increasingly popular in China. A white paper published in May 2020 by the Alibaba-affiliated Ant Group found that 150 million users had enrolled in online mutual aid programs in China as of the end of 2019, and estimated that the number of users would triple by 2025.[5] At the time, Ant Group operated the largest online mutual aid platform, Xiang Hu Bao, which had over 100 million users. Chinese public health insurance is capped at 60% of medical expenses for critical illnesses, so individuals

---

[4] *See* https://www.protocol.com/china/china-health-insurance

[5] *See* https://www.businesswire.com/news/home/20200507005383/en/Chinas-Online-Mutual-Aid-Market-Expected-to-Triple-to-450-Million-Users-by-2025

who cannot afford a commercial insurance policy were previously forced to pay additional costs out-of-pocket. Mutual aid might cover an additional 20% of expenses, drastically reducing these out-of-pocket costs. The white paper found that 70% of online mutual aid participants surveyed said they were not covered by commercial health insurance, but over 42% said they intended to purchase insurance products in the future.

44.     While Waterdrop derived a small amount of revenue in management fees from its mutual aid platform, the main benefit of the platform was that it educated users about health insurance and generated cheap customer leads, as Waterdrop could easily market and sell products to mutual aid users that wished to make the switch to commercial insurance. This data significantly lowered Waterdrop's customer acquisition costs in comparison to competitors.

45.     In July 2016, Waterdrop started a crowdfunding platform, similar to the popular site "GoFundMe" in the United States, which enabled individuals to donate money to cover the medical expenses of other individuals in need. The Company does not earn any revenues from its crowdfunding operations, but, as with the mutual aid platform, the service generates cheaper customer leads and lowers Waterdrop's customer acquisition costs. Due to the nature of the crowdfunding and mutual aid platforms, Waterdrop also built a reputation as a charitable company among consumers, further contributing to the Company's success.

46.     In September 2016, Waterdrop acquired a commercial insurance company, Baoduoduo Insurance Broker Co. Ltd., along with its operating license. This allowed the Company to commence selling commercial insurance products. Due to its integrated technological platform and the wide variety of insurance products Waterdrop offers, it has found moderate success, especially among young, lower income, and semi-rural users. Waterdrop earns the vast majority

of its revenue from this commercial insurance brokerage business by charging insurance companies commissions on the products it sells.

47.     These three interdependent segments made Waterdrop's business model unique. Waterdrop's low customer acquisition costs allowed the Company to compete with much larger insurance companies, and the revenue from the commercial insurance allowed it to continue the philanthropic branches of the business. Zhu Rui, director of the Social Innovation and Business for Good Centre at Cheung Kong Graduate School of Business, explained: "If you separate (the charity activities and the business activities at Waterdrop), the originally profitable insurance business will lose its referral traffic and become uncompetitive; a purely philanthropic Waterdrop Crowdfunding platform isn't likely to survive, either." Additionally, Chinese tech columnist Lan Xi explained: "After users have experienced crowdfunding and mutual aid, they will have more knowledge about and a stronger desire for insurance products… This is fundamental to Waterdrop's ecosystem and a high barrier to entry for other players in the industry."

48.     As Waterdrop explained in the Registration statement:

> Our user-centric platforms enhance user engagement through network effects. Based on comprehensive data accumulated across demographics, medical and health status, behaviors, and social activities, we derive unique consumer insights and develop deep understanding of consumer needs. Leveraging our data insights, big data analytics, and artificial intelligence, we have developed measures that enable effective consumer conversion and continuously provide customized insurance and healthcare solutions to users acquired from our crowdfunding and mutual aid platforms as well as through external marketing efforts.

49.     In recent years, however, Waterdrop relied less on its crowdfunding and mutual aid platforms and more heavily on third party traffic to expand its consumer base, with such channels increasing from just 1.9% of all customer traffic in 2018 to 44.9% of all customer traffic by 2020. Then, in March 2021, Waterdrop announced it would be ceasing its mutual aid platform altogether.

**B.  Increasing Regulations Force Waterdrop to Discontinue its Mutual Aid Platform**

50.     On March 26, 2021, Waterdrop announced that it would be discontinuing its mutual

aid platform starting March 31, 2021.

51.     In an open letter to Waterdrop employees, Defendant Shen wrote:

> We believe it is time to adjust and upgrade our business. To provide users with
> more comprehensive, more stable and more valuable services! To this end, we will
> terminate the [mutual aid plans] currently operated by the water drop mutual aid
> platform, and replace the mutual aid plan with more cost-effective commercial
> health insurance services.
>                                                        . . .
>
> Waterdrop has always been committed to providing users with better protection.
> [This] is the original intention of this adjustment and upgrade. For [those] currently
> still under protection of Waterdrop Mutual Aid members, after obtaining the
> member's consent, we will insure these members more than Waterdrop Mutual Aid.

52.     Despite the attempt to frame the cessation of the mutual aid platform as an

"upgrade," the Confidential Witnesses in this case stated that the platform was shut down to

increased regulatory scrutiny. For example, CW1 stated that the shutdown of Waterdrop's mutual

aid platform was due to regulations put in place by the CBIRC, but that the CEO sent out a letter

explaining that it was an "upgrade," and that mutual aid customers would be given a new insurance

product that would function "identical to Waterdrop's mutual aid."

53.     Similarly, CW2 stated that the cessation of Waterdrop Mutual Aid was due to the

CBIRC's new regulatory requirements in early 2021. CW2 explained that the market began

discussing the CBIRC's regulations in 2020, and in response, some mutual aid platforms ceased

their operation in late 2020 or early 2021, before Waterdrop. In early 2021, CW2 attended a

meeting in which the Company's executives discussed a cessation plan for their mutual aid

platform, and eventually, in March 2021, Waterdrop ceased operating its mutual aid platform.

54.     Media reports and documents published by the CBIRC support the CWs'

statements. A June 2020 article in Nikkei Asia reported that, while the Ant Group white paper

expected the number of mutual aid users to triple by 2025, a lack of governmental regulation could spell problems for the industry in the future.[6] The article noted that there were already several "collapsed mutual aid programs that had more claims than healthy members remaining in the group" and therefore "couldn't pay the claims." Other problems included programs which enticed members with the promise of large payouts, then changed the contracts once members signed on, and a lack of legal basis on how to resolve claim disputes. The article noted that further regulatory oversight would be necessary, quoting an expert's recommendation that the "CBIRC should establish an innovative regulatory approach to the emerging industry."

55.     On September 3, 2020, the CBIRC published a study titled "Analysis of Illegal Commercial Insurance Activities and Countermeasures and Suggestions" (the "Study").[7] The Study found:

> The number of illegal commercial insurance activities is huge and increasing year by year, involving a large amount of money and many consumers, which has caused serious social impact. In the name of insurance, some illegal institutions and personnel conduct fraud, illegal fund-raising, and pyramid schemes, which seriously damage the interests of the masses. Some seriously erode the interests of the industry and affect the stable operation of insurance institutions. The existence of illegal commercial insurance activities not only destroys the credibility of the insurance market, but also affects consumers' confidence in purchasing insurance products, and also causes bad money to drive out good money.

Specifically, the Study noted that "the online mutual aid platforms that have grown rapidly in recent years have the characteristics of commercial insurance in essence, but there is currently no clear regulatory body and regulatory standards," and that "Xiang Hu Bao, ***Waterdrop Mutual Aid*** and other online mutual aid platforms, which are unlicensed operations, have a large number of

---

[6] https://asia.nikkei.com/Spotlight/Caixin/China-s-new-mutual-aid-platforms-fill-hole-in-health-care-coverage

[7] *See* https://tech.sina.com.cn/roll/2020-09-08/doc-iivhvpwy5588409.shtml

members, and ***the stakeholder risks cannot be ignored***." The study concluded that it was necessary

for the CBIRC to "***crack down on illegal commercial insurance activities*** in a timely and accurate

manner, to ensure the healthy and stable development of the insurance market, and to effectively

safeguard the legitimate rights and interests of insurance consumers."

56.     About a week later, on September 9, 2020, tech company Baidu ceased operating

its mutual aid program, reportedly "to protect the rights and interests of users," because it had only

been able to attract about 500,000 users, so dues were not enough to cover claims.[8]

57.     On December 7, 2020, the CBIRC issued a set of "Regulatory Measures for the

Supervision of Internet Insurance Business," (the "Regulatory Measures") to go into effect on

February 1, 2021.[9] The Regulatory Measures instituted a number of new rules meant to regulate

many different aspects of internet insurance companies, including online mutual aid platforms, in

order to decrease the risk of fraud and illegal activity. For example, once the laws went into effect,

any internet-based insurance businesses would need a license to operate, would need increased

cybersecurity, and all financial activities would be overseen by the CBIRC. While many internet-

based commercial insurance platforms already conformed to some of the Regulatory Measures,

most mutual aid platforms did not, and the adjustments would be costly to make for the relatively

low-revenue businesses.

58.     Then, on December 18, 2020, the CBIRC published a circular on "Cases of

Infringement of Consumer Rights and Interests," (the " Dec. 18, 2020 Circular") announcing the

investigation of several online insurance companies for illegally promoting policies with offers

such as "0 yuan for the first month" or "0.1 yuan for the first month," when actually, the first

---

[8] *See* https://kr-asia.com/baidu-shuts-mutual-aid-platform-after-disappointing-growth

[9] *See* http://www.gov.cn/zhengce/zhengceku/2020-12/14/content_5569402.htm

month's premiums were evenly distributed to the later premiums, or the first month's premiums were overcharged.[10] Waterdrop was one of the companies cited in the Dec. 18, 2020 Circular for a policy that was advertised as "3 yuan for the first month," but the cost of the remaining 11 months was not disclosed. The Company was later fined RMB1 million, and Defendant Yang was personally fined RMB100,000.[11] Xinhuanet News stated that these fines were a sign of increasing internet insurance industry regulation and speculated that these regulations would lead to a "reshuffling" of the Chinese insurance industry in the near future.[12]

59.     On January 11, 2021, the CBIRC published the Draft Circular on Further Regulating Online Life Insurance Business (the "Jan. 11, 2021 Draft Circular").[13] The Jan. 11, 2021 Draft Circular, if enacted, would impose a number of requirements on internet insurance companies, for example, in order to obtain a license to operate, internet insurance companies would need to meet certain solvency and credit/risk rating requirements, would need to have certain online operational capabilities, and would be subject to a pricing review mechanism enforced by the CBIRC. Additionally, if the Jan. 11, 2021 Draft Circular was enacted and a Company was found in violation of the policies therein:

> [The] CBIRC will initiate inquiry, investigation, inspection and other regulatory procedures against illegal and non-compliant issues, and under special circumstances may also notify the board of directors of the relevant risks, publicly inform the whole industry, and at the same time pursue the direct liability of the chief actuary as well as the management liability of the main person in charge of the company and the person in charge of the online channel.

---

[10] *See* https://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=950243&itemId=4099&generaltype=0

[11] *See* https://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=1017043&itemId=4113&generaltype=9

[12] *See* http://www.news.cn/fortune/2021-12/01/c_1128118154.htm

[13] *See* http://jtnfa.com/en/booksdetail.aspx?type=06001&keyid=00000000000000005441&PageUrl=majorbook &getPageUrl=booksdetail&Lan=EN

60.     In a press conference on January 22, 2021, the week before the aforementioned Regulatory Measures went into effect, a reporter asked representatives of the State Council Information Office of the CBIRC, "how will the regulatory authorities supervise network mutual assistance in the future?"[14] Xiao Yuanqi, Chief Risk Officer, replied that, in addition to Baidu's mutual aid program, Meituan Mutual Aid had ceased operating in January 2021 due to increasing risks. Like Baidu, Meituan was a prominent Chinese tech and e-commerce ("fintech") company. Yuanqi continued, "going forward, we will pay more attention to the mutual assistance business of network companies, understand their operation mode and risk situation, and then take corresponding measures according to the situation."

61.     In the next few months, almost all of China's mutual aid platforms announced that they would be ceasing operations, including Qingsongchou (March 24, 2021); Hukong Mutual Aid (March 30, 2021); Xiaomi Mutual Aid (April 30, 2021); 360 Mutual Aid (May 18, 2021); and Defendant Waterdrop (announced on March 26, 2021 that the mutual aid program would cease on March 31, 2021). Tech industry news site Protocol explained:

> Online mutual aid started during the golden years of Chinese fintech, when regulations were loose and venture capitalists were placing big bets on digital transformation. But those days are over. China's financial regulators have largely caught up with technological change, and less profitable products like mutual aids are being discarded as the market retrenches to focus on higher-profit opportunities.[15]

62.     Xinhuanet News noted that the cessation was not limited to mutual aid programs – internet insurance companies pulled a number of other insurance products off the market in

---

[14] *See* https://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=961829&itemId=915&generaltype=0

[15] *See* https://www.protocol.com/china/china-health-insurance

response to the Regulatory Measures, and that these regulations may spell the end of some internet insurance companies. The article states:

> Tianfeng Securities analyst Xia Changsheng believes that **small and medium-sized insurance companies will be restricted from selling life insurance products online in the future**, wealth management insurance with aggressive yields will be removed from the shelves, and follow-up long-term insurance products will return to offline operations.

63.     In other words, in order to ensure it could continue to operate as an internet-based insurance broker, Waterdrop needed to rapidly gain more customers and grow its business into one that was essentially "too large to fail." To this end, even before the cessation of Waterdrop's mutual aid platform, the Company began heavily spending on third party marketing to drive traffic to its site. After the cessation of mutual aid, Waterdrop was forced to further increase this spending to make up for the absence of cheaper customer leads driven by that platform.

64.     Despite the increasingly strict regulatory environment, and the uncertain future of internet-based insurance companies in China, and the fact that the Company was spending more and more on customer acquisition, Defendants decided to take their company public in May 2021.

### C.  Waterdrop's Initial Public Offering

65.     After completing a successful round of financing in August 2020, Waterdrop began planning its United States IPO.[16] However, the IPO process was delayed by Chinese regulators.

66.     On April 12, 2021, Reuters reported that, according to inside sources, "Waterdrop had aimed to go public by end-2020 but is now looking to list in the second quarter," and that the delays were due to "pushback" from Chinese regulators because the Company's "business model

---

[16] *See* https://www.pymnts.com/news/ipo/2020/chinese-insurer-waterdrop-plans-united-states-ipo-after-230-million-dollar-fundraise/

is seen as risky."[17] The article stated, according to one source, that the CBIRC "told founder Shen Peng this month that it would not suggest that Waterdrop go public at this point." While regulatory approval was not necessary for the IPO, as Waterdrop is incorporated offshore, the article notes that the "CBIRC's reservations about the IPO do not bode well for such companies' share sale plans in general." Waterdrop denied that Chinese regulators were opposed to its IPO plans.

67.     This would not have been the first time regulators interfered in a Chinese company's US debut. In November 2020, regulators halted the planned IPO of Chinese fintech company Ant Group (administrators of Xiang Hu Bao, the largest Chinese mutual aid program, among other businesses) just days before the company planned to go public.[18] While the Chinese government claimed the halting of the IPO was to protect investors, the New York Times reported that it was, in fact, retaliation for a speech made by Ant Group founder Jack Ma criticizing the increased regulatory oversight of the financial industry.

68.     Regardless of regulatory warnings, Waterdrop proceeded with going public. On April 16, 2021, the Company filed its Registration Statement on Form F-1 with the SEC, which, after an amendment, was declared effective on May 6, 2021. On May 7, 2021, the Company filed a prospectus on Form 424B4, which incorporated and formed part of the Registration Statement.

69.     In the Registration Statement, the Company vaguely stated that it ceased its mutual aid platform "in order to focus on our core businesses and offer enhanced protection to our users," and that contributing factors to the decision were "increased recognition of our brand," "latest

---

[17] *See* https://www.reuters.com/world/china/tencent-backed-waterdrop-faces-pushback-ipo-chinese-regulators-sources-2021-04-13/

[18] *See* https://www.nytimes.com/2020/11/06/technology/china-ant-group-ipo.html#:~:text=China%20Halts%20Ant%20Group's%20Blockbuster,of%20the%20financial%20technology%20giant.&text=Ant%20Challenged%20Beijing%20and%20Prospered,Now%20It%20Toes%20the%20Line

market development," and "recent industry environment changes." Waterdrop did not, however, reveal the true reason behind the cessation of the platform, namely, increased regulatory scrutiny. While the statement mentioned the Regulatory Measures, it did not make any connection between the implementation of the measures and the cessation of the mutual aid program, nor did it mention the CBIRC's September 2020 Study that particularly cited risks with Waterdrop Mutual Aid.

70.     The Registration Statement did warn that there were certain risks associated with the cessation of the mutual aid plan:

> Despite our good intention, our mutual aid participants or general public may view our action as adversely affecting the actual or expected interests of mutual aid participants, which may in turn harm our reputation. In the worst scenario, participants may choose to bring complaints and lawsuits against us.

The Registration Statement also alluded to the fact that Waterdrop may face "monetary" risks from the cessation of the mutual aid platform, and stated, "with the cessation of the Waterdrop Mutual Aid operation, the corresponding management fee income which accounted for 3.6% of total operating revenue in 2020, will no longer be a revenue stream for us in 2021."

71.     These statements did not fully and adequately describe the risks surrounding the cessation of Waterdrop's mutual aid platform. The main benefit the Company derived from mutual aid was not the revenue from management fees, but was the cheaper customer leads the platform generated. Without these leads, Waterdrop would have to spend considerably more to acquire customers in order to maintain the growth of its commercial insurance platform. These risks were not adequately disclosed in the Registration Statement.

72.     Additionally, because Q1:21 ended over a month *before* the IPO, the Registration Statement disclosed certain financial results for that quarter. As a result, the Company disclosed positive results from the quarter, such as it "achieved a solid business growth in the first quarter of 2021," and that "[t]he FYP generated through Waterdrop Insurance Marketplace reached

RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020."

73.     But Waterdrop notably did not disclose that operating costs and expenses had skyrocketed during Q1:21, increasing by more than 75% year over year, which led to a significant net operating loss for the quarter, or that the increase in costs was due, in large part, to the Company's spending on third-party marketing expenses. Instead of disclosing the rapidly accelerating costs, expenses, and losses for Q1:21, the Registration Statement selectively disclosed only some positive aspects of the Q1:21 financial results," thus creating a materially misleading impression of Waterdrop's actual financial condition for that quarter.

74.     Nor did Waterdrop disclose in the Registration Statement that, after Waterdrop's mutual aid program closed and could no longer be used as a source for cheap customer leads and data, these operating costs and expenses were continuing to rise exponentially in Q2:21, increasing more than 50% quarter-over-quarter and 160% year-over-year, even though at the time of the IPO, the Company was approximately halfway through Q2:21, and had been ramping up third party marketing spending for several months.

75.     The Registration Statement was used to sell 30 million Waterdrop ADSs at $12 per ADS to the investing public. Defendants generated US$360 million in gross offering proceeds from their sale of Waterdrop ADSs in the IPO.

76.     On June 1, 2021, in the wake of the IPO, several analysts initiated coverage of Waterdrop. For example, BofA initiated with a "buy" rating, citing the burgeoning market for health insurance in China and stating, "Waterdrop is well positioned for the future growth with its client acquisition and product mix strategies." CLSA analyst Edwin Liu initiated coverage of Waterdrop with a "Buy" rating and a price target of $15.80, stating "[w]ith established brand

recognition and superior customer acquisition abilities, Waterdrop is well positioned to ride on the online life & health insurance boom . . . Regulatory uncertainties remain, but we expect the company to navigate potential challenges." Morgan Stanley initiated coverage on the same day, calling WDH "attractive," and setting a price target of $11.80 (current price was $8.28), noting that a "key feature that differentiates Waterdrop from peers is its crowdfunding business," which "serves as a low-cost traffic portal for insurance sales." The report also noted "[o]ngoing regulatory headwinds in China's internet space and ADR delisting risks are major causes for its share price decline since listing."

### D. Events Following the IPO Reveal the Truth about Waterdrop's Registration Statement

77.     On June 17, 2021, Waterdrop issued a press release announcing the Company's financial results for the first quarter ended March 31, 2021 – *i.e.*, the quarter that concluded over a month before the Registration Statement became effective. The Company reported that its operating costs and expenses had ballooned over 75%, or RMB579.1 million, to RMB1,343.9 million (US $205.1 million). As a result, the Company suffered an operating loss for the quarter of RMB460.6 million (US $70.3 million), compared with operating loss of RMB111.1 million for the same period of 2020 – ***a more than 400% increase***. The release broke down the rapid rise in Waterdrop's expenses in pertinent part as follows:

- Operating costs and expenses increased by RMB579.1 million, or 75.7%, to RMB1,343.9 million (US$205.1 million) for the first quarter of 2021 from RMB764.9 million for the same period of 2020.

- Operating costs increased by 125.5% year-over-year to RMB300.6 million (US$45.9 million) for the first quarter of 2021, compared with RMB133.3 million for the first quarter of 2020, which was mainly due to (i) the cost of RMB76.8 million that incurred in relation to the cessation of the Waterdrop Mutual Aid business, (ii) RMB30.8 million increase in personnel cost as our consultants and insurance agents team rapidly expanded to support the business growth, and (iii) RMB44.3 million increase in professional and outsourced customer service fees.

- Sales and marketing expenses increased by 67.7% year-over-year to RMB837.2 million (US$127.8 million) for the first quarter of 2021, compared with RMB499.2 million for the first quarter of 2020. The increase was primarily due to (i) a RMB247.8 million increase in marketing expenses to third-party traffic channels as a result of our business expansion and branding promotions, and (ii) a RMB100.7 million increase in outsourced sales and marketing service fees to third parties.

78. Analysts were surprised by the increased costs. For example, Michael Li of BofA

wrote, under the heading "Cons: still a long way to go to control acquisition cost":

> The company reported that its client acquisition based on FYP increased by 65%, 52% and 48% via internal conversion, third party traffic and natural traffic/repeat purchases. The growth of the most costly third party traffic continued to outgrow natural traffic, leading to the increase of its sales and marketing expenses by 68% YoY, faster than our FY21 forecast at 49%.

Similarly, Jenny Jiang of Morgan Stanley wrote:

> The product mix shift to long term insurance and further expansion in operating third party traffic have increased both its operating costs (up 68% even excl. one-off shutdown costs of mutual aid platform) and sales & marketing costs (up 67% excl. SBC). As such, net losses for 1Q were slightly higher than our expectation.

Both BofA and Morgan Stanley maintained their price targets of $11.50 and $11.80, respectively.

79. Then, in early August 2021, Chinese media began reporting a "crack down" on tech

companies across various sectors, especially targeted at companies that had completed IPOs in the

United States, which regulators viewed as a security risk. On August 2, 2021, media outlet

SupChina published an article aimed at explaining the situation to Westerners, stating, "[s]ince the

suspension of Ant Group's IPO in November [2020], Beijing has embarked on an unprecedented

clampdown of its technology sector."[19] The article further explained, "China's regulators are

worried about personal data being leaked to foreign adversaries" and "fear that the U.S. might gain

some leverage on U.S.-listed Chinese companies."

---

[19] *See* https://supchina.com/2021/08/02/chinas-big-tech-crackdown-a-guide/

80.     On August 11, 2021, multiple news sources reported that the CBIRC had issued an order directing insurance companies to cease improper marketing and pricing practices rampant in the industry and enhance their user privacy protections. Failure to comply would reportedly result in the offenders being "severely punished" by Chinese authorities.

81.     For example, a Bloomberg story entitled "China Goes After Online Insurance in Widening Crackdown" stated that the "sweeping order goes beyond the targeted action that's hit a few listed online platforms including Waterdrop Inc. . . . since China began a broad crackdown on its fintech sector this year."[20] The article confirmed that "[r]egulators have since moved to shutter some operations including mutual aid healthcare platforms operated by Waterdrop." It continued: "The latest move will stymie growth in an industry that had been expected to grow to 2.5 trillion yuan ($385 billion) in a decade." The article continued in pertinent part as follows:

> "In recent years, online insurance has moved into a fast lane. At the same time, transgressions have been rampant," according to the notice, which cited offenses including some internet platforms illegally operating in insurance, mispricing risks or illicitly using client information. It called for "immediate rectification and regulation."
> . . .
> The overhang presents multiple challenges for Waterdrop, which was one of a few Chinese fintechs to have pulled off an initial public offering this year.

82.     Reuters reported that, due to this "crackdown," the share price of online insurance companies on the Hong Kong Stock Exchange, such as Zhong An (one of the leading online insurance platforms co-invested by Ant Group), Tencent Holdings (affiliated with Waterdrop), and Ping An Insurance Group "tumbled as much as 9% in the morning session."[21]

---

[20] *See* https://www.bloomberg.com/news/articles/2021-08-11/china-regulators-go-after-online-insurance-in-widening-crackdown

[21] *See* https://www.reuters.com/world/china/china-step-up-scrutiny-online-insurance-sector-media-2021-08-12/

83. Michael Li of BofA Securities picked up on the news, writing:

[T]he China Banking and Insurance Regulatory Commission (CBIRC) will soon launch a campaign, targeting the recent issues in online insurance sector, including misleading sales, bundled sales, mis-pricing, illegal operation and user data breaches. We expect major online insurers will be the targets, including Zhong An (6060 HK) and Waterdrop (WDH US). We will gauge the impact on their operation and growth when details are available.

84. On September 8, 2021, Waterdrop issued a press release announcing the Company's financial results for the second quarter ended June 30, 2021. The release stated that Waterdrop's operating losses had continued to accelerate, totaling RMB815.4 million (US$126.3 million) for the quarter, compared with an operating profit of RMB7.2 million for the same period of 2020. This was once again due to a sharp increase in the Company's operating costs and expenses during the quarter, which increased by RMB1,081.1 million, or 160.5% year over year, to RMB1,754.7 million (US$271.8 million) from RMB673.6 million for the same period of 2020. specifically, the Company noted, "Sales and marketing expenses increased by 270.3% year over year to RMB1,244.9 million (US$192.8 million) for the second quarter of 2021, compared with RMB336.2 million for the second quarter of 2020" primarily due to an "RMB734.6 million increase in marketing expenses to third-party traffic channels."

85. On the same day, CLSA analyst Edwin Liu lowered the price target on Waterdrop to $7.00 (from $14.20) while maintaining a "Buy" rating. BofA dropped their price target to $9.58 (from $11.50), citing tightening regulations and the fact that "operating expenses rose by 115% YoY due to the rapid growth of sales and marketing expenses, which surged by 149% YoY."

86. On September 15, 2021, Seeking Alpha reported that Waterdrop's "shares are down more than 75% since their April IPO due to a combination of widening losses and regulatory concerns." The article explained:

Sales and the marketing expenses also more than tripled during the quarter, as the company spent heavily on third-party channels to acquire new users and promote

its brand. One might wonder why Waterdrop, often hailed as one of China's leading insuretech companies, would pay huge sums to third parties to gain potential new customers rather than simply grow organically through its own channels and marketing efforts. To answer this question, we need to step back and look at Waterdrop's development.

. . .

Waterdrop thrived partly by channeling its huge crowdfunding user base, which had positioned the company as a sort of charitable organization, into its more lucrative insurance brokering business. Founder and CEO Shen Peng once told media that premiums derived from users of the mutual aid platform accounted for a sizable 20% of the company's total.

. . .

Sensing imminent regulatory scrutiny, Waterdrop shut down its mutual aid platform at the end of March, a move widely seen as pre-emptive to avoid any uncertainty ahead of its IPO plans that were already underway. Media reports even hinted that the insurance regulator wanted the listing postponed, but Waterdrop went ahead anyway. Thus Waterdrop was forced to jettison one of its biggest referral sources for new insurance business, which may partly explain its current heavy reliance on costly third-party channels as a source for finding new customers.

87.     On September 13, 2021, Waterdrop ADSs dropped to a low of just $3 per ADS – **75% below** the price at which Waterdrop ADSs were sold to the investing public just four months previously. At the time of the filing of the initial complaint in this matter, the price of Waterdrop ADSs was significantly below the IPO price and currently sits at $1.54 per ADS.[22]

88.     Over the next few months, analysts and media outlets continued to report about the effects of regulatory scrutiny on Waterdrop. For example, on October 11, 2021, Equal Ocean published an article titled, "As Crackdown Looms, Chinese Insurtech Waterdrop Enters Next Growth Phase," stating, "Despite a great deal of attention from investors, Waterdrop has been performing poorly" due to rising costs, policy crackdowns, and industry overhauls.

89.     On November 3, 2021, the CBIRC announced that, after the conclusion of a trial, Waterdrop would be fined RMB1 million for the illegal activities described in the Dec. 18, 2020

---

[22] As of close of market on Friday, February 18, 2022.

Circular, which was published months prior to Waterdrop's IPO. Defendant Yang was also personally fined RMB100,000.

90.     On November 30, 2021, after Waterdrop issued a press release announcing the Company's financial results for the third quarter 2021 (Q3:21), BofA Securities lowered its price target to $8.75, noting that "China's crackdown on the whole internet sector this year and tightening rules on online insurance in August made expansion more difficult and less efficient." Further, the analyst report noted, "We cut our 2021 adjusted net income by 49% due to higher than expected marketing expenses." However, the high marketing expenses in the second and third quarters were largely due to the loss of customer leads generated by Waterdrop's mutual aid program, which ceased operating on March 31, 2021– more than a month before Waterdrop's IPO.

91.     On December 2, 2021, CLSA analyst Edwin Liu downgraded Waterdrop from Buy to Outperform with a price target of $1.76 (from $7.00). The analyst commented: "Amid more regulatory scrutiny on online insurance, Waterdrop has changed its strategic focus from revenue to profit by spending less on customer acquisition via third-party channels. The company reported a slowdown in 3Q21 operating revenue, although net loss narrowed. We downgrade from BUY to Outperform, cut our target price from US$7.00 to US$1.76, and reduce our growth forecasts."

92.     On December 6, 2021, Seeking Alpha published an article titled, "Waterdrop Goes Back To The Well, Cutting Losses By Lowering Costs." The article stated:

> Shen established the company in 2016 as a crowdfunding platform providing mutual aid services to patients seeking financing for expensive medical treatments. He wanted to acquire a large user base with the platform first, which he could then cash in on by building up an insurance brokering business. But Chinese regulators had other ideas and believed that companies like his needed official licensing to provide commercial insurance services. Shen was quick to note the risks and shut down the Waterdrop Mutual Aid platform in March this year, costing him a promotion channel for his new insurance business. He then started to search for new promotional outlets after the IPO, pinning his hopes on expensive third-party channels.

. . .

But Waterdrop couldn't stay above the fray as Beijing rolled out a series of measures to crack down on tech companies, sending the company's stock price into a tailspin.

93.     The main factors that media articles and analyst reports agreed led to the massive decline in the price of Waterdrop's ADSs were: 1) the increase in unexpected costs and expenses, particularly third-party marketing expenses, which led the Company to recognize a significant net loss in Q1:21 and Q2:21; and 2) uncertainty surrounding the Company due to increasing regulatory scrutiny of internet-based insurance companies in China. There was ample evidence available to Defendants long before the IPO that both factors were impacting and would impact Waterdrop's business; however, the Registration Statement neglected to adequately disclose or describe the risks the Company was facing, and it failed to disclose the true financial condition of the Company at the time of the IPO. Investors relied on the misleading Registration Statement when purchasing Waterdrop's ADSs in or traceable to the IPO, and were damaged when the Company began trading publicly, the truth was revealed, and the value of the ADSs decreased significantly.

94.     Below is a timeline of the relevant events:



## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS IN THE REGISTRATION STATEMENT

95.     The Registration Statement contained a number of untrue statements of material

fact and omitted material facts necessary to make the statements contained therein not misleading.

### A.  First Quarter 2021 Financial Results

96.     The first quarter of 2021 ended on March 31, 2021, over a month before the

Registration Statement became effective. The Registration contained only positive details about

the Q1:21 financial results. For example, it stated:

> We have achieved a solid business growth in the first quarter of 2021. The FYP
> generated through Waterdrop Insurance Marketplace reached RMB4,469 million
> for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter
> of 2020 or a 42.7% increase from the same period of 2020. (pp. 8, 112).

97.     This statement was materially misleading because Waterdrop had already

experienced a substantial operating loss – not growth – in Q1:21. Indeed, WaterDrop's Q1:21

Form 6-K revealed:

> Operating costs and expenses increased by RMB579.1 million, or **75.7%**, to
> RMB1,343.9 million (US$205.1 million) for the first quarter of 2021 from
> RMB764.9 million for the same period of 2020 . . . Sales and marketing expenses
> **increased by 67.7% year-over-year** to RMB837.2 million (US$127.8 million) for
> the first quarter of 2021, compared with RMB499.2 million for the first quarter of
> 2020 . . . **Operating loss for the first quarter of 2021 was RMB460.6 million
> (US$70.3 million)**, compared with operating loss of RMB111.1 million for the
> same period of 2020.

98.     The Registration Statement also did not disclose that operating costs and expenses

had already skyrocketed during Q1:21, increasing by over 75% year over year, or that the increase

in costs was due, in large part, to the Company's spending on third-party marketing expenses, costs

which continued to rise exponentially during Q2:21, after Waterdrop's mutual aid program ceased

and could no longer be used as a source for customer leads and data. Instead of disclosing the

rapidly accelerating costs, expenses, and losses for the already completed first quarter of 2021, the

Registration Statement selectively disclosed only some positive aspects of the Q1:21 financial results, thus creating a materially misleading impression of Waterdrop's actual financial condition for that quarter.

99.     Analysts expressed surprise when the increase in costs was revealed. Both Michael Li of BofA Securities and Jenny Jiang of Morgan Stanley noted that costs for the first quarter were higher than anticipated, despite the fact that BofA and Morgan Stanley acted as underwriters for Waterdrop's IPO. The increasing costs were also named by several analysts as a catalyst for the post-IPO decline of the stock price.

**B.  Waterdrop's Operating Costs and Expenses**

100.    The Registration Statement made a number of statements regarding Waterdrop's operating costs and expenses, however these statements were false or misleading or omitted material information necessary to make them not misleading.

101.    Most notably, the Registration Statement never revealed what Waterdrop's operating costs and expenses actually were for Q1:21, even though the quarter had already ended over month before the IPO.

102.    The Registration Statement stated:

- We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology. Our business model is highly scalable and our platform is built to support our continued growth. ***We expect our operating costs and expenses to decrease as a proportion of our revenues*** as we improve the operating efficiency of our platform and achieve more economies of scale. (p. 94).

- We ***expect*** our operating costs to increase in absolute terms as our scale of business grows. However, as we improve the operating efficiency of our platform and achieve more economies of scale, ***we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future***. (p. 97).

103.    However, these statements were materially false or misleading. Costs and expenses had already increased for Q1:21, and were ***increasing***, not ***decreasing,*** as a percentage or

proportion to revenue. For the year ending December 31, 2020, costs and expenses were approximately 116% of revenue. For Q1:21, which concluded more than a month prior to the time the Registration Statement became effective, revenue was RMB883.4 million and costs were RMB1343.9 million, so costs were approximately *152%* of revenue. With the cessation of mutual aid, Waterdrop needed to increase spending on third party marketing expenses, which would drive costs even higher. Indeed, for Q2:21, which was well under way at the time the Registration Statement became effective, revenue was RMB939.4 million and costs were RMB1754.7 million, so costs were approximately *186%* of revenue.

104.     Additionally, looking at past quarters, as the scale of Waterdrop's business grew, costs and expenses as a proportion of revenue did not decrease, as reflected in the table below:

| Quarter | Costs as % of Rev. | Quarter | Costs as % of Rev. | Quarter | Costs as % of Rev. |
|---------|--------------------|---------|--------------------|---------|--------------------|
| Q1:19   | 149%               | Q1:20   | 116%               | Q1:21   | 152%               |
| Q2:19   | 90%                | Q2:20   | 98%                | Q2:21   | 186%               |
| Q3:19   | 99%                | Q3:20   | 113%               |         |                    |
| Q4:19   | 129%               | Q4:20   | 133%               |         |                    |

105.     Additionally, the Registration Statement stated:

- We have a history of net losses and negative cash flows from operating activities, which *may* continue in the future. (pp. 7, 21).

- We *anticipate* that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business . . . these efforts *may* incur significant capital investment and recurring costs, have different revenue and cost structures, and take time to achieve profitability. (p. 21).

106.     However, these boilerplate risk factors were phrased as hypothetical – losses "*may* continue in the future," Waterdrop "*may* incur . . . recurring costs" – and omitted the material information that Waterdrop *had* already incurred such costs during Q1:21 and was *continuing* to incur increasing costs in first half of Q2:21.

107.    Under the heading "Expansion of Customer Base," the Registration Statement said:

[O]ur medical crowdfunding operation direct [*sic*] substantial traffic to our insurance marketplace. Approximately 46.5%, 23.0% and 13.0% of the FYP generated through Waterdrop Insurance Marketplace for 2018, 2019 and 2020, respectively, was sourced from traffic from our medical crowdfunding platform. Historically, our mutual aid operation also directed traffic to our insurance marketplace. We see the internal source of consumer traffic as an important and unique consumer acquisition resource to us. (p. 93).

108.    This statement implied that the traffic derived from the mutual aid platform was minimal. Unlike with the crowdfunding, it did not include figures of percentage of FYP generated through the platform. Further, it gave no indication that, after the discontinuation of mutual aid, Waterdrop would be forced to drastically increase spending on third party marketing to make up for the loss of cheaper customer leads.

109.    The statement continued:

In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base. In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively. We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business. (p. 93).

110.    This statement is materially misleading because it neglects to warn investors that, at the time, Waterdrop was consistently and drastically increasing its spending on these third-party traffic channels. Primarily driven by third-party marketing costs, sales and marketing expenses increased by 67.7% year-over-year to RMB837.2 million (US$127.8 million) for Q1:21 (which ended over a month before the Registration Statement became effective) and a staggering ***270.3%*** year over year to RMB1,244.9 million (US$192.8 million) for Q2:21, the first quarter after the mutual aid platform ceased operating. The statement also omits that Waterdrop was attempting to add as many customers as possible in advance of regulatory crackdowns in China, after which it was predicted that only the largest insurance companies would survive.

### C.  Discontinuation of Mutual Aid

111.    The Registration Statement also contained multiple misleading statements about

the discontinuation of Waterdrop's mutual aid program:

- In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. (p. 9).

- In March 2021, we ceased the operation of our Waterdrop Mutual Aid platform in order to focus on our core businesses and offer enhanced protection to our users. (p. 25).

- In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. (p. 83).

112.    These statements are materially false or misleading, because Waterdrop did not

cease operating its mutual aid program to "focus on [its] core businesses," in light of "increased

recognition of [its] brand," or due to the "latest market developments," the shut down was due to

increased regulatory pressure, including the implementation of the CBIRC's Regulatory Measures,

and did not disclose the impact the cessation was having or would have on Waterdrop.

113.    The Registration Statement contained a specific section titled "Regulations on

Mutual Aid Business," which discussed a 2016 ordinance, but this section made no mention

whatsoever of the Regulatory Measures or any other post-2016 regulations. The Registration

Statement also neglected to mention that Waterdrop was not the only Chinese company to

discontinue its mutual aid program. In fact, in response to the Regulatory Measures, almost all

other Chinese mutual aid platforms had ceased operating. The fact that regulators could essentially

shut down an entire industry in the matter of a few months was critical information to

understanding the risks inherent in Waterdrop's business. However, Waterdrop instead

misleadingly framed the discontinuation as a voluntary action it chose to take in the interests of

strengthening its business.

114.    In the indexes at the end of the Registration Statement, Waterdrop said:

The Group has assessed and concluded that the cessation of the mutual aid platform operation is a nonrecognized subsequent event given the cessation decision is made in 2021 following recent industry environment changes. (p. F-54).

However, this reference to "recent industry environment changes" was misleadingly vague because it did not include any mention of the Regulatory Measures, the CBIRC, or anything else that would indicate that Waterdrop's mutual aid program was shut down in response to regulatory scrutiny in China.

115.    Moreover, the Registration Statement contains several other misleading statements regarding the financial effects of the discontinuation of the mutual aid platform:

- We operated Waterdrop Mutual Aid between May 2016 and March 2021, under which we generated management fee income as an operator. (p. 92).

- Starting from March 2021, with the cessation of the Waterdrop Mutual Aid operation, the corresponding management fee income which accounted for 3.6% of total operating revenue in 2020, will no longer be a revenue stream for us in 2021. (p. 96).

- In connection with this business adjustment, we voluntarily undertook to cover mutual aid participants' medical expenses arising from medical conditions diagnosed by March 31, 2021 that would have been covered by the ceased mutual aid plan, subject to certain procedural requirements and eligibility criteria. In addition, we also offered a one-year complementary health insurance policy to each participant with a similar coverage as the participant's original mutual aid plan… The estimated cost of medical expense coverage is RMB15.0 million (US$2.3 million) and the estimated cost of one-year health insurance coverage is RMB81.7 million (US$12.5 million). RMB19.9 million (US$ 3.0 million) will be accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. RMB76.8 million (US$11.8 million) will be recorded as an expense. (p. 96, similar statements on pp. 25, 83, F-54).

116.    These statements are materially misleading because the most significant financial repercussion of discontinuing the mutual aid platform was neither the loss of the management fee income nor the one-time costs recognized in Q1:21 of the medical expenses and one-year policies; it was the loss of the cheaper customer leads and data the mutual aid platform provided. Without

36

these leads, Waterdrop was forced to massively increase its spending on third-party marketing expenses in Q2:21 – a quarter that was nearly halfway over at the time the Registration Statement became effective. Waterdrop did not adequately disclose the increase in these expenses in the Registration Statement.

### D.  Increasing Chinese Regulatory Scrutiny

117.    The Registration Statement also contained misleading statements about the regulatory environment in China, and it severely downplayed the impact that this environment was having and would have on the Company.

118.    For example, it said: "the growth of health insurance sector has been supported by the Chinese government in recent years" and "recent regulatory developments are expected to have positive impacts on China's health insurance industry" including "[a]ccelerating the growth of the health insurance industry, and encouraging the growth of charitable medical donations and medical mutual aid." (p. 122).

119.    However, in late 2020 and early 2021, publications by the CBIRC demonstrated the opposite – that the Chinese Government was cracking down on the health insurance industry, especially medical mutual aid. For example, on September 3, 2020, the CBIRC published an "Analysis of Illegal Commercial Insurance Activities and Countermeasures and Suggestions," which found that the "number of illegal commercial insurance activities is huge and increasing year by year, involving a large amount of money and many consumers, which has caused serious social impact." Specifically, the study noted that "Xiang Hu Bao, Waterdrop Mutual Aid and other online mutual aid platforms, which are unlicensed operations, have a large number of members, and the stakeholder risks cannot be ignored." The study concluded that it was necessary for the CBIRC to "crack down on illegal commercial insurance activities in a timely and accurate manner,

to ensure the healthy and stable development of the insurance market, and to effectively safeguard the legitimate rights and interests of insurance consumers."

120.    Then, on December 7, 2020, the CBIRC published the Regulatory Measures, which instituted a number of new rules meant to regulate many different aspects of internet insurance companies, including online mutual aid platforms, in order to decrease the risk of fraud and illegal activity. In response to the Regulatory Measures, almost every online mutual aid platform shut down, including Waterdrop's mutual aid platform. If the Chinese government was, in fact, "encouraging the growth" of mutual aid platforms, the CBIRC would not have published measures which caused nearly all the platforms to cease operations.

121.    A few weeks later, the CBIRC published the Dec. 18, 2020 Circular, announcing the investigation of several online insurance companies for illegally promoting policies with offers such as "0 yuan for the first month" but misleading customers regarding the costs of the remaining months of the policy. Waterdrop was specifically cited in the Dec. 18, 2020 Circular as one of the companies being investigated. Shortly after that, the CBIRC published the Jan. 11, 2021 Draft Circular, which, if enacted, would impose a number of restrictions on online insurance companies, including giving the CBIRC a pricing review mechanism and the power to investigate and publicly name companies found in violation of the policies.

122.    These publications indicated that the CBIRC was ***increasing*** its regulatory scrutiny of the insurance industry, which would inhibit, not support, the growth of the industry.

123.    The Registration Statement did contain several risk statements regarding the regulatory regime in China; however, these statements omitted material information necessary to make them not misleading. One risk statement, under the subheading "We face uncertainties relating to the change of regulatory regime," stated, in pertinent part:

We operate in a highly regulated industry in China, and the regulatory regime continues to evolve. The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China. Since the online insurance industry in China is evolving rapidly, the CBIRC has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time. We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof. Moreover, there exist uncertainties as to how the regulatory environment might change. On December 14, 2020, the CBIRC published the Regulatory Measures for Online Insurance Business, or the Regulatory Measures, which became effective on February 1, 2021. Shuidi Insurance Brokerage conducts online insurance brokerage business in the PRC and is subject to the Regulatory Measures. The Regulatory Measures significantly changes regulatory regime for online insurance business in various aspects.

. . .

It might be costly for us to stay in compliance with the heightened requirements and standards in the Regulatory Measures. The Regulatory Measures sets out a ramp-up process allowing market participants to achieve full compliance in phases until February 1, 2022; we, however, cannot assure you that we can timely adjust our current business operations to achieve and maintain full compliance. (p. 21-22).

124.     This statement did not indicate that the Regulatory Measures were the reason Waterdrop was forced to shut down its mutual aid program. Indeed, almost every other Chinese mutual aid platform shut down in response to the Measures.

125.     The risk statement continued:

The regulatory framework in China's insurance industry is evolving and undergoing significant changes. Further development of regulations applicable to us may result in additional restrictions on our business operations. We may have to adjust our business practice and operations to comply with the continuously changing regulatory requirements. For example, in January 2021, the CBIRC published the draft Circular on Further Regulating Certain Issues on Internet Life Insurance Business, or the Draft Circular, for comment among insurance industry participants. The Draft Circular requires that each installment of premium of certain insurance products less than one year term, such as accident insurance and health insurance shall be equal. We provide our consumers the option of monthly payments and the first month payment of premium of certain insurance products is typically lower than subsequent installments. We may be required to change such payment regime to comply with the Draft Circular, if the Draft Circular is enacted. (p. 22-23).

126.    This statement is misleading for several reasons. First, it did not mention the prior Dec. 18, 2020 Circular, which had announced that the CBIRC was beginning an investigation into companies that sold products which advertised a low/no payment first month, but misled customers about the costs of the subsequent months, and that companies found in violation of the policy could be fined. Notably, the problem described in the December 18, 2020 Circular was not the general practice of having a lower first month premium, but the practice of misleading customers about the costs of the remainder of the policy. Additionally, the risk statement did not mention that Waterdrop had been specifically cited by the Dec. 18, 2020 Circular and, at the time the Registration Statement was filed, was being actively investigated by the CBIRC. This investigation eventually led to Waterdrop incurring an RMB1 million fine, and Defendant Yang personally incurring a fine of RMB100,000.

127.    Second, the Registration Statement failed to mention that the Jan. 11, 2021 Draft Circular, if enacted, would impose a number of other requirements on internet insurance companies, for example, in order to obtain a license to operate, internet insurance companies would need to need certain solvency and credit/risk rating requirements, would need to have certain online operational capabilities, and would be subject to a pricing review mechanism enforced by the CBIRC. Additionally, if the Draft Circular was enacted and a Company was found in violation of the policies therein:

> [The] CBIRC will initiate inquiry, investigation, inspection and other regulatory procedures against illegal and non-compliant issues, and under special circumstances may also notify the board of directors of the relevant risks, publicly inform the whole industry, and at the same time pursue the direct liability of the chief actuary as well as the management liability of the main person in charge of the company and the person in charge of the online channel.

The Registration Statement did not warn of risks related to any of these other provisions of the Jan. 11, 2021 Draft Circular.

128.     The next risk statement, under the heading "The administration, interpretation and enforcement of the regulations applicable to us are evolving and involve uncertainties. We may not be able to stay in constant compliance with the rapidly evolving regulations," stated:

> [W]e have from time to time been subject, and are likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations. If any non-compliance incidents in our business operation are identified, we may be required to take certain rectification measures in accordance with applicable laws and regulations, or we may be subject to other regulatory actions such as administrative penalties. (p. 24).

129.     Once again, this statement omitted that Waterdrop was *currently* being investigated for its practice of advertising policies for "3 yuan for the first month" but misleading customers about the costs of the remaining months, an illegal practice described in the Dec. 18, 2020 Circular.

130.     Neither of these risk statements mentioned the September 3, 2020 Study in which the CBIRC promised to "crack down on illegal commercial insurance activities" and called Waterdrop's mutual aid program a "stakeholder risk" that "cannot be ignored."

131.     These statements materially misled investors regarding the regulatory environment in China and the effects of recent regulatory actions on Waterdrop's business. If the Registration Statement had accurately described these risks, investors would not have been surprised by further regulatory crackdowns in the summer of 2021, one of the main factors to which analysts attributed the crash in the price of Waterdrop's ADSs.

## CLASS ACTION ALLEGATIONS

132.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all individuals and entities that purchased or acquired Waterdrop ADSs pursuant or traceable to the Company's Registration Statement, seeking to

pursue remedies under Sections 11 and 15 of the Securities Act. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

133.    The members of the Class are so numerous that joinder of all members is impracticable. Waterdrop ADSs are actively traded on the NYSE and millions of ADSs were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Waterdrop or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

134.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

135.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

136.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)    whether Defendants violated the Securities Act;

(b)    whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations, and risks of investing in Waterdrop; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

### THE STATUTORY SAFE HARBOR DOES NOT APPLY

137.    Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 15 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the IPO alleged herein.

### CLAIMS FOR RELIEF

### COUNT I

**For Violation of Section 11 of the Securities Act**
**Against All Defendants**

138.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

139.    This claim is brought under § 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

140.    This claim does not allege, and does not intend to allege, scienter, fraud, or fraudulent intent, which is not a required element of § 11, and any implication of scienter, fraud, or fraudulent intent is hereby expressly disclaimed. This claim is based solely on strict liability and negligence.

141.    The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

142.     Waterdrop is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement. The Individual Defendants signed or authorized the signing of the Registration Statement on their behalf. The Underwriter Defendants marketed and underwrote the IPO and sold the Waterdrop ADSs issued in the IPO to Lead Plaintiff and the Class.

143.     As the issuer of the shares, Waterdrop is strictly liable to Lead Plaintiff and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to Lead Plaintiff and the Class for such material misstatements and omissions. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

144.     Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate. Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained misrepresentations and/or omissions of material fact. As such, Defendants are strictly liable to Lead Plaintiff and the Class

145.     By reason of the conduct alleged herein, Defendants violated § 11 of the Securities Act. Lead Plaintiff and the Class members purchased common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations. At the time of their purchases,

Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein

146.     Because of the foregoing, Lead Plaintiff and the members of the Class are entitled to damages under Section 11 of the Securities Act.

## COUNT II

### For Violation of Section 15 of the Securities Act
### Against All Defendants, Except the Underwriter Defendants and Defendant De Vries

147.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

148.     This claim is brought under § 15 of the Securities Act, 15 U.S.C. §77o, against all Defendants, except the Underwriter Defendants and Defendant DeVries.

149.     The Individual Defendants controlled Waterdrop at the time of the IPO by virtue of their dominant voting power and status as the Company's controlling shareholders, directors and/or senior officers. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Waterdrop.

150.     Defendant Waterdrop controlled the Individual Defendants and all of its employees.

151.     Defendant Cogency Global controlled Defendant De Vries and all of its employees, and served as the authorized U.S. representative for the Company.

152.     The Defendants named herein each were culpable participants in the violations of § 11 of the Securities Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing

of the Registration Statement, selling Waterdrop ADSs in the IPO and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

153.    By reason of the conduct alleged herein, these Defendants violated § 15 of the Securities Act, and Lead Plaintiff and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

154.    **WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

(e)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: February 21, 2022                    Respectfully Submitted,

                                        **KAHN SWICK & FOTI, LLC**

                                        */s/ Kim E. Miller*
                                        Kim E. Miller (KM-6996)
                                        250 Park Avenue, 7th Floor
                                        New York, NY 10177
                                        Telephone: (212) 696-3730
                                        Facsimile: (504) 455-1498
                                        Email: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Qi Mi
and the Class*