UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                 :      21cv7683 (DLC)

SIDNEY SANDOZ, individually and on  :
behalf of all others similarly     :
situated,                          :     OPINION AND ORDER
                                 :
                 Plaintiff,      :
                                 :
               -v-              :
                                   :
WATERDROP INC. et al.,            :
                                   :
                 Defendants.     :
                                   :
------------------------------------- X

APPEARANCES:

For Lead Plaintiff:
Kahn Swick & Foti, LLC
Kim Elaine Miller
250 Park Avenue
Suite 2040
New York, NY 10177

For the defendants Waterdrop Inc., Cogency Global Inc., and
Colleen A. DeVries:
Quinn Emanuel
Michael Barry Carlinsky
51 Madison Avenue, 22nd Floor
New York, NY 10010

For defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co
LLC, and BofA Securities, Inc.:
O'Melveny & Myers LLP
Jonathan Rosenberg
Abby F. Rudzin
7 Times Square
New York, NY 10036

DENISE COTE, District Judge:

    In this putative securities class action, investors in

Waterdrop Inc. ("Waterdrop"), a Chinese insurance company,

allege that there were material omissions in Waterdrop's registration statement and prospectus (collectively, the "Registration Statement") associated with its initial public offering in May 2021 ("IPO").  The crux of the plaintiff's claims are that Waterdrop failed to warn investors of the risks associated with the regulatory environment in China, disclose the extent of the costs and expenses Waterdrop was incurring at the time of its IPO, and disclose certain information about its decision to close a segment of its business.

The defendants who have appeared have moved to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P.  The motion is granted.

## Background

The following facts are drawn from the first amended complaint ("FAC") and documents on which it relies.  For the purposes of deciding this motion, the Lead Plaintiff's factual allegations are accepted as true, and all reasonable inferences are drawn in the Lead Plaintiff's favor.

I.   Waterdrop

Waterdrop -- "Shuidi" in Chinese -- is a Chinese insurance technology platform.  Prior to the events giving rise to this action, Waterdrop consisted of three different segments: a mutual aid platform ("Mutual Aid"), a medical crowdfunding platform, and an insurance marketplace.

2

Waterdrop launched Mutual Aid in 2016.  Through the Mutual Aid platform, individuals would contribute small amounts of money to Mutual Aid monthly.  The Mutual Aid fund would pay medical expenses of eligible beneficiaries.  Mutual Aid did not generate significant revenue for Waterdrop, but it allowed Waterdrop to educate its users about health insurance and to market insurance products to them.

Later in 2016, Waterdrop started a crowdfunding platform and acquired a commercial insurance company.  The crowdfunding platform allowed users to make donations to cover others' medical expenses.  Like Mutual Aid, this platform did not generate much revenue for Waterdrop, but it generated customer leads for its marketing of commercial insurance.

Through its commercial insurance company, Waterdrop sold insurance to consumers and earned revenue through commissions on the products it sold.  The interaction of the three segments of Waterdrop was critical to its business model: it used Mutual Aid and the crowdfunding platform to drive customers to its commercial insurance company.

China has regulated online insurance companies such as Waterdrop more heavily in recent years.  They are regulated by the China Banking and Insurance Regulatory Commission ("CBIRC").  On September 3, 2020, the CBRIC published a study that raised concerns about online mutual aid platforms and concluded that

3

the CBIRC had to "crack down on illegal insurance activities."
The study specifically cited Waterdrop as an example.  On
December 7, the CBIRC issued Regulatory Measures for the
Supervision of Internet Insurance Business ("Regulatory
Measures").  The Regulatory Measures included a license
requirement for insurance businesses.

Some days later, on December 18, the CBIRC published a
circular on Cases of Infringement of Consumer Rights and
Interests ("December Circular").  The December Circular
announced a CBIRC investigation of online insurance companies
that advertised discounted first month premiums when that
premium's cost was actually distributed over later premiums.
The December Circular identified Waterdrop as a company that
employed this practice.

On January 11, 2021, the CBIRC published the Draft Circular
on Further Regulating Online Life Insurance Business ("January
Draft Circular").  If enacted, the January Draft Circular would
have imposed more requirements on online insurance companies.
Violations of those requirements were to be investigated and
pursued through enforcement actions by the CBIRC.

Following these regulatory changes, in March 2021,
Waterdrop discontinued the Mutual Aid platform.  Almost all
other mutual aid platforms in China also ceased operations.  Two
confidential witnesses ("CW") employed at Waterdrop stated that

4

the cessation of Mutual Aid was due to the increased regulatory scrutiny.  CW1 was a customer service staff member from November 2019 to October 2021, and CW2 was a Finance Business Partner from April 2020 to March 2021.

Around the same time, Waterdrop was preparing its IPO.  It was reported in the media that the CBIRC opposed Waterdrop going public and that this had delayed Waterdrop's IPO.  Waterdrop denied those claims.

On April 16, 2021, Waterdrop filed its registration statement on Form F-1, which was amended and declared effective on May 6.  On May 7, Waterdrop filed a prospectus on Form 424B4, which incorporated and formed part of the registration statement.  The documents are referred to collectively as the Registration Statement.  Waterdrop sold 30 million American Depository Shares ("ADS") at $12 per ADS in its IPO.

On June 17, 2021, Waterdrop issued a press release reporting its financial results for the first quarter of 2021 ("1Q21").  Waterdrop reported that costs and expenses had increased 75% year to year and that the company had suffered an operating loss.  Later, in August, media reported a regulatory "crack down" on Chinese technology companies across a variety of sectors, especially those that had completed U.S. IPOs. Waterdrop was expected to be a target of the crackdown.

On September 8, Waterdrop announced its financial results for the second quarter of 2021, which stated that operating costs continued to accelerate.  On September 13, the price of Waterdrop's ADSs decreased to $3 per share.  When this action was commenced on September 14, Waterdrop's ASDs were priced at $1.54 per share.

On November 3, the CBIRC announced that Waterdrop was being fined RMB1 million[1] for the advertising activities detailed in the December Circular.  Later that month, Waterdrop announced its financial results from the third quarter of 2021. Thereafter, analysts lowered the price targets for Waterdrop ADSs and noted the impact that increased regulatory scrutiny and higher marketing expenses were having on Waterdrop.

II.  The Registration Statement

The claims rest on the adequacy of the disclosures in the Registration Statement.  Pertinent material from the Registration Statement is quoted below.  The statements upon which the plaintiff relies are highlighted in bold.[2]  Any emphasis from the FAC is indicated by underlining.  The statements principally appear in the following sections of the Registration Statement: Prospectus Summary; Risk Factors; and

---

[1] Renminbi ("RMB") is the official currency of China.

[2] When the same statement is repeated within the Registration Statement, the statement is recited only once in this Opinion.

Management's Discussion and Analysis of Financial Condition and Results of Operations ("Analysis of Financial Condition").  The statements upon which the plaintiff relies that appear in other sections are indicated accordingly.

A.   Prospectus Summary

The Registration Statement begins with a summary of Waterdrop's business model, risks associated with the IPO, and recent developments in Waterdrop's finances.  Waterdrop notes that it "face[d] uncertainties relating to the change of regulatory regime."

The Registration Statement also describes certain 1Q21 results.  It states:

> **We have achieved a solid business growth in the first quarter of 2021.  The [first year premium ("FYP")] generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020.**

> We continued to diversify our customer acquisition channels.  In the first quarter of 2021, 54.5% of the FYP generated via Waterdrop Insurance Marketplace was sourced from third-party traffic channels, while 34.4% and 11.0% of the FYP generated via Waterdrop Insurance Marketplace was sourced from natural traffic and repeat purchase, and internal traffic, respectively.

The Registration Statement's summary also refers to the end of Mutual Aid:

> **In light of our expanded business and prospect [sic], the increased recognition of our brand, and the latest market development, we have decided to focus on our**

**core businesses and offer enhanced protection to our users.**  Our Waterdrop Mutual Aid service historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage.  In March 2021, we ceased the operation of the Waterdrop Mutual Aid business, offering to migrate all mutual aid participants as insurance policyholders of our Waterdrop Insurance Marketplace service.

Lastly, the summary includes financial data that explained that operating costs and expenses had increased from RMB426,313 in 2018, to RMB1,705,445 in 2019, to RMB3,524,194 in 2020.  A significant portion of the increased costs and expenses came from increases in sales and marketing expenses, which increased from RMB184,943 in 2018, to RMB1,056,494 in 2019, to RMB2,130,535 in 2020.

B.   Risk Factors

Waterdrop details several risks in the Registration Statement.  First, it addresses risks related to its operating losses:

> **We have a history of net losses and negative cash flows from operating activities, which <u>may</u> continue in the future.**
>
> **. . .   We <u>anticipate</u> that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business,** acquire new users, invest and innovate in our technology infrastructure and further develop our product and service offering and increase brand recognition.  Any of **these efforts <u>may</u> incur significant capital investment and recurring costs, have different revenue and costs structures, and take time to achieve profitability.**

(Underlining reflects emphasis added by plaintiff.)

The Registration Statement then explains the risks stemming from the regulatory environment in China[3]:

**We face uncertainties relating to the change in regulatory regime.**

**We operate in a highly regulated industry in China, and the regulatory regime continues to evolve.  The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China.  Since the online insurance industry in China is evolving rapidly, the CBIRC has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time.  We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof.  Moreover, there exist uncertainties as to how the regulatory environment might change.**

**On December 14, 2020, the CBIRC published the Regulatory Measures for Online Insurance Business, or the Regulatory Measures, which became effective on February 1, 2021.  Shuidi Insurance Brokerage conducts online insurance brokerage business in the [People's**

---

[3] A separate section of the Registration Statement titled Industry discusses the health insurance sector in China:

**[The] growth of health insurance sector has been supported by the Chinese government in recent years.** In an announcement made in January 2020, the CBIRC has set the 2025 total health insurance premium target at RMB2 trillion (compared with RMB707 billion in 2019). A series of regulatory policies have been introduced since 2014, aiming to promote the commercial health insurance development from multiple dimensions. According to the iResearch report, the following **recent regulatory developments are expected to have positive impacts on China's health insurance industry[, including a]ccelerating the growth of the health insurance industry, and encouraging the growth of charitable medical donations and medical mutual aid.**

Republic of China ("PRC")] and is subject to the
Regulatory Measures.  The Regulatory Measures
significantly changes regulatory regime for online
insurance business in various aspects.

After detailing the requirements in the Regulatory
Measures, the Registration Statement continues:

It might be costly for us to stay in compliance with
the heightened requirements and standards in the
Regulatory Measures.  The Regulatory Measures sets out
a ramp-up process allowing market participants to
achieve full compliance in phases until February 1,
2022; we, however, cannot assure you that we can
timely adjust our current business operations to
achieve and maintain full compliance. . . .

The regulatory framework in China's insurance industry
is evolving and undergoing significant changes.
Further development of regulations applicable to us
may result in additional restrictions on our business
operations.  We may have to adjust our business
practice and operations to comply with the
continuously changing regulatory requirements.  For
example, in January 2021, the CBIRC published the
draft Circular on Further Regulating Certain Issues on
Internet Life Insurance Business, or the Draft
Circular, for comment among insurance industry
participants.  The Draft Circular requires that each
installment of premium of certain insurance products
less than one year term, such as accident insurance
and health insurance shall be equal.  We provide our
consumers the option of monthly payments and the first
month payment of premium of certain insurance products
is typically lower than subsequent installments.  We
may be required to change such payment regime to
comply with the Draft Circular, if the Draft Circular
is enacted.

The Registration Statement goes on to say:

As of the date of this prospectus, the Draft Circular
is still pending approval and has not come into
effect.  It remains uncertain when and how the Draft
Circular would come into effect, and whether and how
CBIRC would promulgate relevant rules related to us.

The attention of our management team could be diverted
to these efforts to cope with an evolving regulatory
or competitive environment.  Meanwhile, staying
compliant with the restriction may result in
limitation to our business scope, limitation to our
product and service offerings, and reduction in our
attraction to consumers.  As a result, our business
and results of operations might be materially and
adversely affected.

Expanding on the regulatory environment, the Registration

Statement cautions:

**The administration, interpretation and enforcement of
the regulations applicable to us are evolving and
involve uncertainties.  We may not be able to stay in
constant compliance with the rapidly evolving
regulations.**

**. . .  [W]e have from time to time been subject, and
are likely again in the future to be subject to PRC
regulatory inquiries, inspections and investigations.
If any non-compliance incidents in our business
operation are identified, we may be required to take
certain rectification measures in accordance with
applicable laws and regulations, or we may be subject
to other regulatory actions such as administrative
penalties.**

Under a different subheading in the Risk Factors section,

the Registration Statement explains the risks associated with

ending Mutual Aid:

We face reputational, monetary, and legal risks in
relation to our discontinuation of the Waterdrop
Mutual Aid business.

**In March 2021, we ceased the operation of our
Waterdrop Mutual Aid platform in order to focus on our
core businesses and offer enhanced protection to our
users.**  We have offered to migrate all mutual aid
participants as insurance policyholders of our
Waterdrop Insurance Marketplace service. . . .
Despite our good intention, our mutual aid

11

participants or general public may view our action as
adversely affecting the actual or expected interests
of mutual aid participants, which may in turn harm our
reputation.  In the worst scenario, participants may
choose to bring complaints and lawsuits against us.
Although we were contractually permitted to terminate
the mutual aid plans any time in our discretion,
lawsuits may nevertheless be time consuming and
costly, and distract our management's attention.

The Registration Statement also warns of risks relating to

rising third-party advertising costs:

We leverage third-party user acquisition channels to
bring in some of new users to our platforms and may
incur significant costs on paying our user acquisition
channels service fees.

. . .  [W]e have incurred significant expenses on
paying third-party user acquisition channels marketing
fees.  If certain of existing third-party user
acquisition channels require higher rates of marketing
fees or we fail to negotiate favorable terms with them
or find new third-party user acquisition channels, our
cost of user acquisition may increase, and our results
of operations may be adversely affected.

C.   Analysis of Financial Condition

Under the subheading titled Expansion of Consumer Base, the

Registration Statement speaks to Waterdrop's history of consumer

acquisition:

Our insurance consumers mainly come from three
sources.  Firstly, **our medical crowdfunding operation
direct [sic] substantial traffic to our insurance
marketplace.  Approximately 46.5%, 23.0% and 13.0% of
the FYP generated through Waterdrop Insurance
Marketplace for 2018, 2019 and 2020, respectively, was
sourced from traffic from our medical crowdfunding
platform.  Historically, our mutual aid operation also
directed traffic to our insurance marketplace.  We see
the internal source of consumer traffic as an
important and unique consumer acquisition resource to**

**us,** and in addition we consider this cohort of consumers with stronger awareness of insurance protection and stronger interest in the content and product offerings on our platforms, and more loyal to our services.

**In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base.  In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively.  We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business.**

The Registration Statement also addresses Waterdrop's operating costs:

**We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology.  Our business model is highly scalable and our platform is built to support our continued growth. We expect our operating costs and expenses to decrease as a proportion of our revenues** as we improve the operating efficiency of our platform and achieve more economies of scale. . . .

**We expect our operating costs to increase in absolute terms as our scale of business grows.  However, as we improve the operating efficiency of our platform and achieve more economies of scale, we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future.**

(Underlining reflects emphasis added by plaintiff.)

Lastly, the Registration Statement elaborates on Waterdrop's decision to terminate Mutual Aid.[4]  It states, "**We**

---

[4] With respect to Mutual Aid, the index attached to the Registration Statement also states, "**The Group has assessed and**

operated Waterdrop Mutual Aid between May 2016 and March 2021,

under which we generated management fee income as an operator."

Discussing this management fee income, it continues:

> Starting from March 2021, with the cessation of the
> Waterdrop Mutual Aid operation, the corresponding
> management fee income which accounted for 3.6% of
> total operating revenue in 2020, will no longer be a
> revenue stream for us in 2021.

> On March 26, 2021, we announced the termination of the
> Waterdrop Mutual Aid business by the end of March
> 2021.  In connection with this business adjustment, we
> voluntarily undertook to cover mutual aid
> participants' medical expenses arising from medical
> conditions diagnosed by March 31, 2021 that would have
> been covered by the ceased mutual aid plan, subject to
> certain procedural requirements and eligibility
> criteria.  In addition, we also offered a one-year
> complementary health insurance policy to each
> participant with a similar coverage as the
> participant's original mutual aid plan. . . .

> The estimated cost of medical expense coverage is
> RMB15.0 million (US$2.3 million) and the estimated
> cost of one-year health insurance coverage is RMB81.7
> million (US$12.5 million).  RMB19.9 million (US$3.0
> million) will be accounted for as a reduction of
> management fee revenue previously recognized for each
> participant to the extent of the cumulative amount
> earned until March 26, 2021.RMB76.8 million (US$11.8
> million) will be recorded as an expense.

III. Procedural History

This action was filed on September 14, 2021, as a putative

class action.  It brought securities fraud claims against

---

concluded that the cessation of the mutual aid platform
operation is a non-recognized subsequent event given the
cessation decision is made in 2021 following recent industry
environment changes."

Waterdrop and certain of its officers and directors[5]; Cogency
Global Inc. ("Cogency"), Waterdrop's authorized U.S.
representative at the time of the IPO; Colleen DeVries, a senior
vice president at Cogency; and six underwriters of Waterdrop's
IPO: Goldman Sachs (Asia) LLC, Morgan Stanley & Co LLC, BofA
Securities, Inc., China Merchants Securities (HK) Co. Limited,
CLSA Limited, and Haitong International Securities Company
Limited (the "Underwriter Defendants"). The putative class is
composed of investors who purchased Waterdrop ADSs pursuant to
the Registration Statement.

On December 8, Qi Mi was appointed Lead Plaintiff pursuant
to the Private Securities Litigation Reform Act of 1995
("PLSRA"), 15 U.S.C. § 78u-4(a)(3). The Lead Plaintiff filed
the FAC on February 21, 2022. The FAC alleges that (1) the
defendants violated § 11 of the Securities Act of 1933
("Securities Act"), id. § 77k, and (2) all defendants except the
Underwriter Defendants and DeVries violated § 15 of the
Securities Act, id. § 77o. The defendants who have been served
moved to dismiss the FAC on April 22.[6] The motion became fully

---

[5] The individual defendants include Peng Chen, Waterdrop's CEO
and Chairman; Kangping Shi, Waterdrop's CFO; and Waterdrop
directors Nina Zhou, Kai Huang, Haiyang Yu, Yao Hu, and Guang
Yang.

[6] As of the date of this Opinion, defendants China Merchants
Securities (HK) Co. Limited, CLSA Limited, and Haitong

submitted on July 21.  This case was reassigned to this Court on August 17.

## Discussion

To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face." Green v. Dep't of Educ. of the City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In securities fraud actions, a court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

"Section 11 imposes absolute liability on the issuer of a registration statement if: (1) the statement contained an untrue statement of a material fact, (2) the statement omitted to state a material fact required to be stated therein, or (3) the omitted information was necessary to make the statements therein not misleading." Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64, 84 (2d Cir. 2021) (citation omitted).  "[A] plaintiff

International Securities Company Limited and the individual defendants except for DeVries have not been served.

bringing a claim under Section 11 need not allege scienter, reliance, or loss causation." Id. (citation omitted). "Section 15, in turn, creates liability for individuals or entities that control any person liable" under § 11. In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citation omitted). "[T]he success of a claim under [S]ection 15 relies, in part, on a plaintiff's ability to demonstrate primary liability" under § 11. Id.

A statement or omission "is material if a reasonable investor would view it as significantly altering the total mix of information made available." Set Capital LLC, 996 F.3d at 84 (citation omitted). This is an "objective, totality-of-the-circumstances inquiry." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 146 (2d Cir. 2017). Courts must read registration statements "cover-to-cover" and "consider whether the disclosures and representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." In re ProShares Trust Sec. Litig., 728 F.3d 96, 103 (2d Cir. 2013) (citation omitted). The context "includes, for example, all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs." Nomura Holding Am., Inc., 873 F.3d at 151.

17

"[W]hen a registration statement warns of the exact risk
that later materialized, a Section 11 claim will not lie as a
matter of law." In re Proshares, 728 F.3d at 102 (citation
omitted). "Under the bespeaks caution doctrine, alleged
misrepresentations in a stock offering are immaterial as a
matter of law if it cannot be said that any reasonable investor
could consider them important in light of adequate cautionary
language set out in the same offering." Rombach v. Chang, 355
F.3d 164, 173 (2d Cir. 2004) (citation omitted).

The FAC alleges that the Registration Statement was
misleading for failing to disclose (1) the extent of Waterdrop's
expected operating losses in 2021, (2) the impact of the Chinese
regulatory environment on Waterdrop's business, and (3) the
motivation behind and financial consequences of Waterdrop's
decision to close Mutual Aid.  Each category of omissions will
be discussed in turn.  The defendants contend that the
statements to which the Lead Plaintiff points are accurate and
that the Registration Statement accurately discloses the risks
of investing in Waterdrop and the company's financial condition.

Read in context, the Registration Statement adequately
warned investors of the risks associated with Waterdrop and its
IPO, including the increase in operating costs, the regulatory
regime, and the closure of Mutual Aid.  The FAC has failed to
plead that any of the statements in the Registration Statement

were materially misleading or that there were material omissions from the Registration Statement.

I.   Operating Losses in 2021

The FAC alleges that the Registration Statement omitted material information about Waterdrop's operating losses.  It alleges that the Registration Statement failed to adequately disclose the increase in operating costs and expenses and that the increases were in large part due to the discontinuation of Mutual Aid and the rise in third-party marketing expenses.  The FAC alleges that the Registration Statement was also misleading for failing to disclose the operating costs and losses from 1Q21.  Each claim will be discussed in turn.

A.   Operating Expenses

The Lead Plaintiff alleges that the Registration Statement's stated expectation that operating costs would decrease as a percentage of Waterdrop's net operating revenue "in the foreseeable future" as Waterdrop improved its "operating efficiency," was misleading because costs and expenses had already increased in 1Q21 and continued to increase in the second quarter.  The FAC further alleges that the Registration Statement's statements that a "history of net losses and negative cash flows from operating activities . . . may continue in the future" and that Waterdrop "anticipate[s] that [its]

operating costs and expenses will increase in the foreseeable future" were misleading for the same reason.

The claim that Waterdrop failed to accurately describe its increase in operating expenses fails. Repeatedly, the Registration Statement states that operating costs and expenses had increased and were expected to continue to increase "in the foreseeable future" as Waterdrop worked to expand its business. The Registration Statement did not say nor suggest that operating costs would decrease in 2021 either absolutely or as a percentage of net operating revenue.

The Registration Statement also included a section entitled Special Note Regarding Forward-Looking Statements in which it noted:

> This prospectus contains forward-looking statements that reflect our current expectations and views of future events. . . .  Known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. . . .  These forward-looking statements involve various risks and uncertainties.  Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect.  Our actual results could be materially different from our expectations.

This warning regarding forward-looking statements specifically identified "financial conditions, and results of operations."  This meaningful cautionary language

renders immaterial the statements about expectations for
the future to which the FAC points.

In opposing this motion, the Lead Plaintiff concedes that
these statements are forward-looking but argues that they were
not accompanied by meaningful cautionary language.  This
argument fails.  Explicitly stating that the company anticipated
operating costs to increase in the foreseeable future along with
the warnings about forward-looking statements were more than
enough to caution investors about Waterdrop's financial
condition.

B.   Increase in Third-Party Marketing Expenses

The FAC alleges that the Registration Statement failed to
warn investors that Waterdrop had increased spending on third-
party marketing.  It points to statements about Mutual Aid's
historical role in "direct[ing] traffic to [the] insurance
marketplace" and its expectation that "third-party traffic
channels" would "play an important role in the future to support
the rapid growth of our business" and alleges that these
statements are misleading for omitting that Waterdrop needed to
increase its spending on third-party marketing because of the
closure of Mutual Aid.

The Registration Statement specifically advises investors
of the increase in third-party marketing expenses.  Under Risk
Factors, the Registration Statement explains that Waterdrop

21

"leverage[s] third-party user acquisition channels to bring in some of new users [sic] to our platforms and may incur significant costs on paying our user acquisition channels service fees."  The Registration Statement adds that Waterdrop had "incurred significant expenses on paying third-party user acquisition channels marketing fees" and warns that these costs "may increase."

The financial data recited in the Registration Statement for the years 2018, 2019, and 2020 demonstrated the dramatic growth in third-party marketing expenses each year. Additionally, the Registration Statement data also showed how internal traffic to the insurance marketplace had been driven by third-party channels in recent years rather than Mutual Aid.

In opposition to this motion, the Lead Plaintiff ignores these ample disclosures in the Registration Statement.  Instead, the Lead Plaintiff maintains that the statements about third-party marketing were materially misleading because they did not include a discussion of the economic impact of Waterdrop's closure of Mutual Aid.  This argument ignores the description of Mutual Aid in the Registration Statement, including the description of its historical role in educating millions of Chinese consumers about the importance of insurance coverage. The Registration Statement explained that Waterdrop had closed Mutual Aid and that an increase in third-party marketing

22

expenses was well underway even before it closed Mutual Aid in March 2021.  In sum, investors were sufficiently warned about the increase in third-party marketing expenses and their potential impact on Waterdrop's financial condition.

C.   1Q21 Financial Results

Finally, the FAC alleges that the Registration Statement was materially misleading for failing to disclose Waterdrop's first quarter financial results, specifically its operating losses in 1Q21.  The FAC alleges that because the Registration Statement included some information about the 1Q21 -- specifically, that Waterdrop had "achieved a solid business growth in the first quarter of 2021" -- it was a material omission for the Registration Statement to omit that in 1Q21, operating costs and expenses had increased more than 75%, when measured year over year, and that the company experienced an operating loss.  The FAC points to financial analysts' reports and the drop in Waterdrop's share price after the announcement of the 1Q21 financial results to demonstrate the impact this omission had on investors.

This claim fails.  First, a company has no obligation to report its quarterly financial results before they have been finalized.  The first quarter ended on March 31, 2021, and the

Registration Statement was effective May 6, 2021.[7] Waterdrop's 1Q21 financial results were announced five weeks later, on June 17, 2021.  While the Lead Plaintiff notes that Waterdrop included some general statements about the growth in Waterdrop's business in 1Q21, the FAC has not plausibly alleged that the 1Q21 financial results were finalized by the date of the IPO.

Significantly, as already described, the Registration Statement made robust disclosures about its operating expenses. The Registration Statement made no promises about Waterdrop's 1Q21 financial condition, stated that operating costs had been increasing over the past three years, and warned that they were likely to increase.  The FAC has not plausibly alleged that a reasonable investor would be misled about Waterdrop's financial condition given these disclosures.

II.  Regulatory Environment in China

The FAC alleges that Registration Statement contained misleading statements and omissions regarding China's regulatory environment for companies like Waterdrop.  The FAC points to statements in the Registration Statement that "the growth of the health care insurance sector has been supported by the Chinese government" and that "recent regulatory developments are

---

[7] The Registration Statement includes the prospectus, which was filed on May 7, 2021 and incorporated into the registration statement.

expected to have positive impacts on China's health insurance industry." The FAC alleges that these statements painted a misleadingly positive picture of the regulatory environment. Additionally, the FAC asserts that the Registration Statement's description of the regulatory regime was misleading for failing to mention the December Circular; to give a more detailed discussion of the January Circular; and to explain that Waterdrop was being investigated pursuant to the December Circular at the time of the IPO.

These claims fail. The statement about the health insurance regulations to which the FAC points is a description of the health insurance sector generally, and not a description of the online insurance industry in which Waterdrop operates. The Registration Statement repeatedly advises investors of the risks to Waterdrop's business posed by the Chinese regulatory regime. For example, it states, "We face uncertainties relating to the change in regulatory regime." It describes the Regulatory Measures and the January Draft Circular in detail and warns that Waterdrop cannot ensure that it will be able to comply with new regulations in a timely manner. As to potential regulatory investigations into Waterdrop, the Registration Statement also discloses that Waterdrop has been and expects to be subject to regulatory action, which could result in penalties. These disclosures notified investors of the risks

stemming from the regulatory environment.  The FAC fails to plead that these statements are false, misleading, or that more needed to be said to adequately warn of the regulatory challenges to Waterdrop's business.

The Lead Plaintiff argues that it was a material omission for the Registration Statement to fail to disclose that Waterdrop was under investigation pursuant to the December Circular, which ultimately led to Waterdrop being fined in November 2021.  This argument fails.  First, the Registration Statement explicitly warned investors that Waterdrop had been under investigation by CBIRC and likely would be again. Furthermore, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 98 (2d Cir. 2021) (citation omitted).

In further support of this argument, the Lead Plaintiff relies on Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245 (2d Cir. 2014).  In Meyer, the Second Circuit held that, on a motion to dismiss, a reasonable investor may find a company's assertion in a registration statement that it was taking steps to comply with environment regulations misleading when, less than a month later, the company submitted a report to the regulatory body detailing its existing problems and deficiencies in complying with the relevant regulations.  761 F.3d at 251.

Meyer is distinguishable.  The FAC fails to plead that Waterdrop knew in May 2021 that its advertising practices would result in it being fined in November 2021, six months after its IPO.

III. Termination of Mutual Aid

In a final category of claims, the FAC alleges that the Registration Statement failed to disclose that the closure of Mutual Aid was due to the Chinese regulatory regime.  The FAC also alleges that the Registration Statement included misleading statements about the financial impact on Waterdrop of terminating Mutual Aid.  Neither allegation succeeds in stating a claim.

A.   Motivation Behind Termination of Mutual Aid

The FAC alleges that the Registration Statement failed to disclose that Waterdrop terminated Mutual Aid because of the increasingly strict regulatory environment in China.  It cites a September 15, 2021 article in the publication Seeking Alpha that connects the heightened regulatory scrutiny to Waterdrop's decision to end Mutual Aid ("September 2021 Article").  The FAC also asserts that the Registration Statement's descriptions of Waterdrop's reasons for discontinuing Mutual Aid were materially misleading in light of this omission.  It points to the Registration Statement linking the closure of Mutual Aid to Waterdrop wanting to "focus on [its] core businesses," the

"latest market development," and "recent industry environment changes."

This claim fails.  To begin with, the Registration Statement describes the regulatory environment in China in considerable detail and warns investors of the risks to Waterdrop's business stemming from that environment.  It explains that the online insurance industry is highly regulated in China and describes the enhanced supervision of the CBIRC. It adds that it already had been subject to regulatory investigations and may be subject to penalties.

Of course, information about the government regulations was publicly available to investors.  The FAC fails to plead how any omission from the Registration Statement of a further explanation of Waterdrop's reasons for closing Mutual Aid significantly altered the mix of information available to a reasonable investor.

B.   Financial Impact of Termination of Mutual Aid

The FAC also alleges that the Registration Statement included misleading statements about the financial impact of Mutual Aid's closure.  The Lead Plaintiff alleges that the Registration Statement's description of the consequences from the termination of Mutual Aid should have included a discussion of customer leads and data.  The FAC alleges that Waterdrop had

to increase its spending on third-party marketing because of
this loss.

This claim fails.  It is interwoven with several of the
claims that have already been dismissed.  It is noteworthy that
the Registration Statement warns specifically that "We face
reputational, monetary, and legal risk in relation to our
decision to discontinue" Mutual Aid.  It also noted that the
Mutual had "historically served as a scenario for educating and
familiarizing millions of users with the importance of insurance
coverage" and that Mutual Aid had "directed traffic to [the]
insurance marketplace."  Furthermore, as previously described,
the Registration Statement describes its increases in third-
party marketing expenses.  Read as a whole, the Registration
Statement adequately warns of the impact that ending Mutual Aid
had on the business of Waterdrop.

In sum, the FAC has failed to plead that the defendants
violated § 11 of the Securities Act.  Because there was no § 11
violation, the FAC's § 15 claims also fail.

IV.  Request for Leave to Amend

The Lead Plaintiff requests that, if the defendants' motion
to dismiss is granted, he be given leave to amend the FAC.  In
general, leave to amend should be "freely give[n] when justice
so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend may be
denied, however, "for good reason, including futility, bad

29

faith, undue delay, or undue prejudice to the opposing party."
Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 98 (2d Cir.
2019) (citation omitted).  Additionally, a plaintiff "need not
be given leave to amend if it fails to specify . . . how
amendment would cure the pleading deficiencies in its
complaint."  TechnoMarine SA v. Giftports, Inc., 758 F.3d 493,
505 (2d Cir. 2014).

The Lead Plaintiff's request for leave to amend is denied.
The Lead Plaintiff has not identified how further amendment
would address the deficiencies in the FAC.  The statements
included in the FAC fail to state a claim under the Securities
Act, and as such, amendment would be futile.

### Conclusion

The defendants' April 22 motion to dismiss is granted.  The
claims against the remaining defendants will also be dismissed.
There is no basis to find that the claims against the remaining
defendants, who have yet to be served, are distinguishable and
would survive.  The Clerk of Court shall close the case.

Dated:     New York, New York
           February 3, 2023

_____
DENISE COTE
United States District Judge

30